Filed 2/27/23  In re A.M. CA3

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Plumas)

----

| | |
|---|---|
| In re A.M. et al., Persons Coming Under the Juvenile Court Law. | C096017 |
| PLUMAS COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C.M.,<br><br>Defendant and Appellant. | (Super. Ct. No. JV-2100004 & JV-2100005) |

C.M., is the father of children A.M. (four years old) and K.M. (six years old).  On February 14, 2022, the juvenile court conducted a contested six-month review hearing

1

under Welfare and Institutions Code section 366.21, subdivision (e).[1]  (§§ 366.21, 395.)
Following that hearing, the juvenile court terminated father's reunification services, but
continued them for the children's mother.[2]  On appeal, father contends the order should
be reversed because the Plumas County Department of Social Services (the Department)
failed to provide him with reasonable services.  We affirm.

BACKGROUND

I

*Petitions*

In April 2021, the Department filed section 300 petitions on behalf of A.M. (then
age three) and K.M. (then age four), alleging father was unable to provide regular care for
the children due to his mental illness.  (§ 300, subd. (b).)  Father was experiencing
delusions leading him to accuse mother of drinking the children's blood.  Father's
delusions also lead him to accuse mother, as well as several prominent politicians and
celebrities, of sexually abusing the children.

The Department also alleged that, as a result of his mental illness, father refused to
allow social workers and law enforcement into his home, which is fortified with gates
and guard dogs, to assess the home for safety.  When father did meet with the social
worker and law enforcement, he wore a handgun displayed on his hip.  Father would not
allow the children "out of his sight" and the younger child, A.M., had developmental
delays.

This behavior, the Department alleged, put the children at risk of serious
emotional damage.  (§ 300, subd. (c).)  Father also made graphic statements about the
accusations of sexual abuse in front of the children.  According to father, when the

---

[1]     Further statutory references are to the Welfare and Institutions Code unless
otherwise indicated.

[2]     Mother is not a party to this appeal.

children saw pictures of Prince Harry, Donald Trump, Kim Jong-un, or President Joe Biden on the internet, the children would report that these individuals hurt them. At the time of the petition, the children were both experiencing "withdrawal" and "anxiety."

II

*Detention Hearing*

In the April 14, 2021 detention report, the Department recommended the children be detained. The family had a significant history with child protective services in both Sacramento County and Plumas County, dating back to 2016, when K.M. was born. In 2016, the parents abandoned K.M. in the intensive care unit for two weeks. In 2019, father was arrested for domestic violence. That same year, mother sought psychiatric help; she reported sexually abusing K.M.[3] Mother also said she tried to kill father.

In 2021, father contacted the Department through "various crisis lines." He reported the children were "victims of a cult that had perpetrated sex crimes" and he was offered counseling services for himself and the children. Father either ignored or refused the offers for services. Father also reported that mother involved the children in a cult that drank the children's blood and made the children eat human feces and sexually abuse animals. Father also said he believed K.M. could speak to his dead grandmother, which allowed K.M. to solve multiple murders.

On April 19, 2021, the juvenile court ordered the children detained pending the jurisdiction hearing. The court also ordered services be provided "as soon as possible" and father be provided supervised visitation twice a month for one hour. In addition, the

---

[3] Mother's therapist subsequently said mother "did not abuse her children and 'any statements she may have made contrary to this were done under extreme emotional distress fueled by social isolation, confusion, and fear and have no basis in reality.' " Counsel for the children also advised the juvenile court that Dr. April Bay, who performed the children's psychological evaluation, reported that both children "have scores of zero for likelihood of sexual abuse."

court appointed a guardian ad litem for father after counsel noted he was a "stroke victim" who also had communication issues; counsel was not convinced father understood the process.

## III

### *Contested Jurisdiction Hearing*

The Department's jurisdiction report noted that father's visitation with the children began on April 28, 2021. That visit was telephonic and was supervised by two social workers. During that call, K.M. told father she had a scratch on her leg "near her bottom." Father did not accept the foster parent's explanation and repeatedly asked K.M. "[w]here is the scratch? On your butt?" He called the Department the next day to talk about " 'concerning things,' during the call with the children."

Father denied involving the children in conversations about mother's alleged behavior; said the children were the ones who initiated conversations about sexual issues; and said the allegations against him were either fabricated or misunderstandings. Father also refused the social worker's offer of a webcam to facilitate virtual visits. Ultimately, the Department recommended the children remain in the custody of the juvenile court, and father continue with supervised visitation twice a month either telephonically or virtually.

At the May 10, 2021 contested jurisdiction hearing where the father testified, the juvenile court adopted the Department's recommendations, sustained the allegations in the petition, took jurisdiction over the children, and set the matter for disposition.

## IV

### *Initial Disposition Hearing*

On May 17, 2021, social worker Heidi Hysmith attempted to interview father, but he refused to participate "until his attorney explained the purpose of the interview." Father said he was " 'tired of talking to you guys [the Department], the truth gets twisted.' " Father then accused the Department of refusing to take relevant evidence and

4

ignoring his allegations of sexual abuse. Several hours later, he agreed to participate; a second social worker joined the interview.

During the interview, father made more bizarre accusations about mother, cults, drug cartels, and alleged molestation of the minors, similar to those he had made before. He also accused mother of injecting the children with methamphetamine and said K.M.'s foot hurt because mother had a tracking device implanted there. The social workers offered to take all of father's evidence and give it to his lawyer but reminded him only the judge could return the children to his custody. This angered father, who had not seen the children in 16 days. The social workers reassured him they were working on setting up a phone call and would continue to do so as soon as they finished talking to him. Before they ended the call, father accused two social workers of " 'licking and fingering his girls and engaging in sex parties.' " They reassured him that was not the case.

During a phone call on May 3, 2021, father again accused the social workers of sexually abusing the children. While on the call, father continued to talk over the social worker as she attempted to address his concerns. After asking him repeatedly to let her speak and warning him she would hang up if he continued to talk over her, the social worker ended the call. Father immediately called back and made more accusations about mother drugging him so she could sexually abuse the children and described numerous incidents of abuse he witnessed. When the social worker offered to send father to a therapist to deal with these traumatic experiences, he became angry.

The Department opined father could not safely maintain the children in his home because of his "mental illness and involving the children in his alternate perception of reality." Father did, however, attend every visit offered and was "mostly appropriate," although he occasionally had to be redirected because he would talk about the case and coach the children. When he was redirected, father became hostile to the supervising social workers. A case plan was prepared for both parents.

5

At the May 24, 2021 disposition hearing, the juvenile court learned father's visits were all virtual and asked why the visits could not be in-person. The Department indicated that, given father's conduct, they could not start in-person visits without "a therapeutic element" and the children had not yet had their behavioral assessments, which would provide "additional clarification as to what would be appropriate and what is available." Those assessments were scheduled to take place approximately two weeks after the hearing.

At the hearing, the father requested a contested disposition hearing. The juvenile court then continued the matter. Despite the Department's concerns, the court ordered in-person visitation for father. The visits were to take place in the Department's facilities with at least two social workers present. The court reiterated the Department had the authority to end a visit if anything inappropriate occurred.

V

*Contested Disposition Hearing*

The contested disposition hearing took place on June 21, 2021. Days earlier, the Department filed an addendum to the disposition report recommending father's visitation be reduced from weekly to twice a month and that reunification services be provided as set forth in the May 24, 2021 case plan.

At the hearing, father testified the children were molested and he tried to get them help. According to father, K.M. said, "over 100 adults, and probably 35, 45 children" have sexually abused her; he also believed mother consumed the children's blood. Father protects the children by keeping them away from mother. Father denied preventing law enforcement or social workers from entering his property, and he described behavior from both children that concerned him, K.M. in particular. Father was also concerned that mother had a tracking device implanted in K.M.

If the children were returned to him, father agreed the Department could have "regular contact" with them and he would be "open to welfare checks on a regular basis."

6

Father, however, did not believe parenting classes were necessary, nor was a psychological evaluation. He also was adamant that he did not suffer from delusions; he was only trying to get justice for his children. Father was visiting the children once a week, in person, for approximately two hours. He had not missed a single visit offered and, in his opinion, the visits were going well.

Social worker Melissa Smith testified that the case plan required father to attend parenting classes, obtain a psychological evaluation and mental health assessment, visit the children, and participate in family therapy. She gave father a referral for the mental health assessment, but he had been "very unwilling to participate in services." According to Smith, father would get "totally upset when we try to discuss it." She further testified that the case plan could be modified based on the results of father's assessments and psychological evaluation, but those had not yet been done.

The juvenile court issued dispositional orders, including weekly visitation and adoption of the May 24, 2021 case plan. Over father's strenuous objection, the court also ordered the children vaccinated.

## VI

### *Interim Review Hearing*

The Department's September 2021 interim review report noted that in June, the children were moved to a home in Plumas County in order to, among other things, require less travel for father's visits because father had some physical limitations. During one visitation, the social worker observed father whispering in K.M.'s ear, after which K.M. told the social worker that her mother molested her. After that visit, K.M. repeatedly told her foster mother that "her privates hurt."[4] The foster mother also

---

[4]  At the time, mother was sober, fully participating in services, and had only supervised visitation with the children.

reported an increase in the children's negative and destructive behaviors after visiting father, as well as when they were told a visit was upcoming.

During late summer 2021, the Department had to cancel in-person visits due to the Dixie Fire. In lieu of in-person visits, the Department offered father virtual visitation and agreed to "make up all canceled in-person visitation once it is safe to do so." On seven occasions between July 29, 2021 and August 20, 2021, however, when the Department reached out to set up a virtual visit for father, he did not respond.

Appended to the September 2021 interim report was a lengthy letter sent to father by social worker Smith. Smith cataloged the many efforts the Department made to reach father between July 16, 2021 and August 25, 2021. Smith listed 13 separate attempts to contact father, including the several attempts to schedule virtual visitation. On August 19, 2021, after not hearing from father for several weeks, Smith contacted law enforcement and requested a welfare check on father. Law enforcement reported back to her that father was not contacting the Department because he "did not want to deal with the Department."

Smith also advised father of the reunification services ordered by the juvenile court at the disposition hearing, including a mental health assessment, a psychological evaluation, and a substance use disorder assessment. She noted that a referral to behavioral health was submitted on his behalf three times and warned if he failed to contact behavioral health in 10 days, the current referral would close. She would, however, continue to resubmit the referral monthly "in order to insure the Mental Health and Substance Abuse Services are available to you."

A referral to Plumas Rural Services for numerous other court-ordered services also was submitted and several service providers attempted to contact father, often to no avail. The service providers who were able to reach father told Smith that father did not understand why he had to participate in services. Father told the providers he did not "need the services," or the services were "a mistake that will be addressed in Court."

Smith advised father to contact the Department and engage in the "Court Ordered Case Plan Services."

By the time of the September 2021 interim report, the Department reported that father "refused or declined all Court Ordered Case Plan Services and has not contacted the Department since July 16, 2021."

At the September 13, 2021 interim review hearing, father was present along with his counsel and guardian ad litem. Father's counsel advised the juvenile court that father was not participating in reunification services, although he was "advised to do so." Counsel also advised that father repeatedly asked for new counsel; his guardian ad litem opposed the request. The juvenile court advised father to begin participating in services, affirmed the orders already in effect, and set the six-month review hearing. The court did not appoint new counsel.

VII

*Contested Six-Month Review Hearing*

The Department's December 6, 2021 six-month review report recommended father's reunification services be terminated. Father was refusing to participate in "any Case Plan Services, including Visitation with his children, and has made no observable behavioral change to safely parent the children." Father refused any visitation with the children after July 23, 2021 and "refused any form of contact with the Department." He refused all of the Department's efforts to engage him in services, including but not limited to, money for gas, transportation, a webcam for virtual visits, email contact, and "multiple repeated referrals for services to appropriate agencies." He told service providers "he did not want them to continue to contact him as he was not interested in participating in their offered services." As result of father's "total disengagement," the Department concluded there was a "substantial likelihood that reunification will not occur[.]"

9

On December 13, 2021, father's counsel and guardian ad litem appeared for the six-month review hearing; father failed to appear. The Department advised the juvenile court that father "absolutely refuses to discuss anything with [them] or contact them." Counsel, however, was surprised father was not there, given their discussions. In father's absence, counsel declared a conflict and requested new counsel be appointed. The guardian ad litem agreed the appointment of new counsel was consistent with father's wishes. The court agreed to relieve father's counsel and appoint new counsel and found good cause to continue the hearing to December 27, 2022.

The matter was continued a few more times and the contested hearing eventually took place on February 14, 2022. Father's new counsel and guardian ad litem were present, but father was not. Counsel indicated father had been "on the fence" about appearing when they last spoke, but as of that morning, it was clear he was not going to be there. Counsel asked for a continuance, which the juvenile court denied because they were operating under statutory time limits and "there doesn't appear to be any legitimate reason for [father] not being here."

The juvenile court advised counsel the question presented at this hearing was whether to terminate father's reunification services. Citing section 366.21, subdivision (e)(5), the court understood it could terminate services if father had not contacted or visited the children for six months.

The current social worker, assigned in November 2021, was Ava Hagwood. Hagwood testified the Department was recommending father's services be terminated because, among other things, father failed to participate in the case plan. Father's last contact with the Department was in September 2021. During that conversation, father said, "he wanted nothing to do with the Department . . . he was not interested participating due to making a lot of allegations against the Department, against the Court, saying that he disagreed with his children being removed and what was being said in the court reports." The last time anyone in the Department saw father in person, was July

10

2021—over six months prior. That was also the last time he participated in visitation with the children.

Hagwood understood that father had some physical limitations, but she did not think those limitations rendered him incapable of participating in services. Many of the services father was required to participate in were offered virtually, so father did not have to travel. Many services were also offered in father's hometown and he would not have to travel more than 10 minutes.

Since her assignment to the case in November 2021, Hagwood twice reached out to father by email; once in January and once in February. She asked him to send proof of his participation in services and each time sent him a copy of the court-ordered case plan. Father did not respond to either email.

Hagwood did not attempt to reach father by phone because, based on her prior contact with father, she asked for and received permission from her supervisor to contact him only by email. She described taking a call from father in the summer 2021, before she was assigned to the case. During that call, father accused Hagwood's coworkers of being involved in a sex-ring. He accused other people in the Department, the juvenile court, the judge, and his own attorney of engaging in "illegal activities." Hagwood said his behavior could only be described as "hostile."

Hagwood described Smith, the previous social worker, as "incredibly diligent in contacting [father], going above and beyond, to make those attempts to contact and have communication[.]" Hagwood also confirmed that father was sent a copy of the six-month review report.

Following argument from counsel, the juvenile court found by clear and convincing evidence that father "has not contacted or visited the children for six months." The court acknowledged father's last visit was in July 2021, after which "the Department pretty much lost contact" with father. The court found that father "was not willing to do anything that might have facilitated the visits." The court also found by clear and

convincing evidence that reasonable services were offered but father was "unwilling to participate." Accordingly, the court terminated father's reunification services pursuant to section 366.21, subdivision (e)(5), continued services for the children's mother, and set the matter for a 12-month family reunification review hearing.

## DISCUSSION

Father does not challenge the juvenile court's finding that he failed to contact or visit the children for six months prior to terminating his services. Nor does he challenge the court's authority to terminate his reunification services at the six-month review hearing.[5] Rather, he argues the Department was required to provide him reasonable services despite his failure to visit the children, and substantial evidence does not support the juvenile court's finding that reasonable services were provided. We are not persuaded.

### I

### *Legal Principles*

At each review hearing, if the child is not returned to his or her parent, the juvenile court is required to determine, by clear and convincing evidence, whether "reasonable services that were designed to aid the parent or legal guardian in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent." (§§ 366.21, subds. (e)(8), 366.22, subd. (a).) "The 'adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' [Citation.] To support a finding that reasonable services were offered or provided to the parent, 'the record should show

---

[5]    Indeed, such a challenge would fail, when the juvenile court finds by clear and convincing evidence "the parent has failed to contact and visit the child," it may terminate family reunification services at a six-month review hearing. (§§ 366.21, subd.(e)(5), 361.5 (a)(2)(B); see *Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1017; *In re Monique S.* (1993) 21 Cal.App.4th 677, 682-683.)

that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult.' " (*In re M.F.* (2019) 32 Cal.App.5th 1, 13-14, italics omitted.)  The services provided do not have to be the best services that could have been provided, rather they must have been reasonable under the circumstances.  (See *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969, citing *In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

We review the juvenile court's determination of reasonable services for substantial evidence.  (*In re Christina L.* (1992) 3 Cal.App.4th 404, 414.)  "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.)

The burden is on the appellant to show the evidence is insufficient to support the juvenile court's findings.  (*In re M.F., supra*, 32 Cal.App.5th at p. 14.)  We "must view the evidence in a light most favorable to the respondent.  We must indulge in all legitimate and reasonable inferences to uphold the verdict.  If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (*In re Misako R., supra*, 2 Cal.App.4th at p. 545.)

*Analysis*

After reviewing the record, we find father's arguments unavailing. Father first contends the Department knew he "had difficulty trusting and communicating with others, particularly such people as service providers, law enforcement, and government officials like the department's own social workers." He contends the Department failed to develop a case plan that would help father "get past these issues" and participate in the reunification process. Father cannot, however, challenge the case plan itself, which was part of the court's disposition order, because he did not appeal from that order. (*Sara M. v. Superior Court, supra*, 36 Cal.4th at p. 1018.) "[A]n unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order." (*In re Jesse W.* (2001) 93 Cal.App. 4th 349, 355.)

In any event, the Department created the case plan based on the information it had at that time: father appeared to be suffering from delusions; was involving the children in his delusions; and had a history of domestic violence. The primary component, as underscored at the interim hearing by the juvenile court, was the mental health assessment and psychological evaluation. The case plan could have been modified if father had engaged at all, but father refused to participate in those services. As a result, the Department could not even identify any of father's more specific needs in order to modify the case plan.

Furthermore, father fails, even now, to suggest what services should have been provided to force or cajole him to participate. Reunification services are voluntary and cannot be forced on an unwilling parent. (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1233.) A social worker is not required to " 'take the parent by the hand and escort him or her to and through classes or counseling sessions.' " (*Ibid.*)

Next, father contends the Department made minimal effort to offer him therapeutic visitation, as required by the case plan. This contention also lacks merit. At the

jurisdiction hearing, the Department indicated therapeutic visitation had not yet begun because it required an assessment of the children, which had not yet happened due to scheduling issues. In lieu of therapeutic visitation, however, the Department agreed visitation would happen with two social workers present, and that is precisely what occurred until father stopped participating in visitation in July 2021.[6] Importantly, father's services were not terminated because he failed to participate in therapeutic visitation, they were terminated because he failed to contact or visit the children *at all* for six months.

Father also contends his ability to visit the children was hampered by his inability to drive more than 45 minutes and the Department failed to accommodate his limitation. This assertion is wholly contradicted by the record. The Department acknowledged this limitation and relocated the children to be closer to father to better facilitate visitation. The Department also offered father virtual visitation, even before the Dixie Fire; they even offered him a webcam, which he refused.

Ignoring his own failure to engage, father also argues the Department simply "gave up" on him and made no effort to overcome his struggles to comply with the case plan. This contention is belied by the record. The record shows the Department made every reasonable effort to communicate with father and encourage him to participate in services. Social workers called him and emailed him; they sent law enforcement to his house when they could not reach him.

Yet rather than participate in services, even begrudgingly, father remained hostile to the social workers and the process. He accused the Department of ignoring relevant evidence and engaging in sex acts with the children. He accused the juvenile court and his attorneys of working against him and engaging in illegal activities. Nonetheless, the

---

**6**    Hagwood testified that according to Smith's notes, Smith did "invite" father to participate in therapeutic visitation "sometime after July 2021."

Department persisted, along with his attorney and his guardian ad litem. But even when father was participating in visitation, he refused to participate in any other services.

By December 2021, father had made it clear to the Department and to several service providers that he had no interest in engaging in services. Despite his refusals, Hagwood continued to reach out to father by email. She emailed him in January and again in February; she sent him his case plan and reminded him he was ordered by the juvenile court to participate. Father remained silent and continued making no effort to see the children, participate in any services, or even remain in contact with the Department.

By the February 14, 2022, six-month review hearing, it had been more than six months since father visited or contacted the children. "There is no purpose served in continuing to offer services where a parent, absent extenuating circumstances, makes no effort to reach out to his or her child for six months in the dependency process." (*In re Monique S., supra*, 21 Cal.App.4th at pp. 682-683.) No such extenuating services exist here where father not only failed to visit the children but refused to participate in services.

Finally, father suggests the services he was offered were not reasonable because the Department failed to explain to him the consequences if he failed to participate. Again, we disagree. The Department made it clear to father that he was ordered to participate in services. Then, at the interim review hearing, five months before his services were terminated at the six-month review hearing, the juvenile court advised father to start participating in services. Most importantly, however, father had both counsel and a guardian ad litem supporting him inside and outside the courtroom. Their job was to help him understand the process and the consequences of his failure to participate; there is no evidence, and no argument has been made, that they failed to do that job. Indeed, at the interim review hearing, counsel said she had advised father to start engaging in services. Father ignored her advice.

16

Under the circumstances of this case, we conclude the Department made reasonable efforts to provide father with reunification services. It was father's own resistance and hostile behavior that limited the Department's ability to provide him with the services he needed for reunification. (See *In re Christina L., supra*, 3 Cal.App.4th at pp. 417-418 [parent's resistance to participating in services supported the conclusion the agency made a good faith effort to provide services under the circumstances].) Accordingly, we further conclude substantial evidence supports the court's order terminating father's reunification services.

DISPOSITION

The juvenile court orders are affirmed.

\s\ ,
McADAM, J.*

We concur:

\s\ ,
MAURO, Acting P. J.

\s\ ,
KRAUSE, J.

---

\* Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution